IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

KEVIN MICHAEL BROWN,

Defendant.

CRIMINAL ACTION FILE NO.:

1:25-CR-274-VMC-JKL-3

## ORDER AND FINAL REPORT AND RECOMMENDATION

Defendant Kevin Michael Brown ("Kevin Brown") is charged in this case with one count of bank fraud conspiracy under 18 U.S.C. § 1349 and two counts of money laundering under 18 U.S.C. § 1957, arising primarily out of an alleged auto loan fraud scheme. [Doc. 1 at 1-6, 9-10.] The case is before the Court on his motion to suppress evidence—specially a laptop computer and an iPhone that law enforcement seized during a search of his residence pursuant to a federal search warrant. [Doc. 57; *see also id.* at 3 (identifying computer and iPhone at issue).[1]] The government has filed a brief in opposition [Doc. 62], and the

---

[1] Also pending before the Court is Kevin Brown's motion to seal his motion, the search warrant application, the search warrant, and the return. [Doc. 56 (motion to seal), 56-1 (motion to suppress), 56-2 (application and warrant), 56-3 (warrant return).] Because all Defendants have been charged, there is no basis for those materials to remain under seal. The motion is therefore **DENIED** [Doc. 56], and the Clerk is **DIRECTED** to unseal docket entry 56 in its entirety.

deadline for Kevin Brown to file a reply has passed.  For the reasons that follow, it is **RECOMMENDED** that the motion be **DENIED**.

## I.      BACKGROUND

On June 10, 2025, a grand jury returned a twelve-count indictment against Kevin Brown; his brother, Hugh A. Brown ("Hugh Brown"); and Hugh Brown's wife, Brittney Gilliams Brown ("Brittney Brown").  [Doc. 1 (indictment).]  Count One charges all three Defendants with bank fraud conspiracy in violation of 18 U.S.C. § 1349, arising out of an alleged auto loan fraud scheme where Defendants duped lenders into providing loans for nonexistent vehicles.  [*Id.* at 1-6.]  Count Two charges Hugh Brown separately with bank fraud under 18 U.S.C. § 1344, arising out of an alleged Paycheck Protection Plan ("PPP") fraud scheme.  [*Id.* at 6-8.]  And Counts Three through Twelve variously charge the three Defendants with money laundering in violation of 18 U.S.C. §1957, relating to transactions involving the money allegedly obtained in the auto loan and bank fraud schemes. [*Id.* at 9-10.]

On July 28, 2025, United States Postal Inspection Service ("USPIS") Inspector Keith L. Speers applied to United States Magistrate Judge Catherine M. Salinas for a search warrant for a residence located at 105 Sir Lancelot Court, Fayetteville, Georgia (the "Lancelot Court residence"), which law enforcement

believed was being used by all three Defendants.  [*See* Doc. 56-2 (search warrant application and search warrant).[2]]  To establish probable cause, Inspector Speers provided an affidavit in which he explained that the three Defendants had been indicted in connection with an auto loan fraud and money laundering scheme and that Hugh Brown had been charged with bank fraud based on an alleged fraudulent application for PPP funds.  (Speers Aff. ¶¶ 5, 7-9.)

Inspector Speers related information linking all three Defendants to the Lancelot Court residence.  According to the affidavit, they listed the Lancelot Court address on their current Georgia driver's licenses and received mail there. (Speers Aff. ¶¶ 12, 20.)  Geolocation data from June 25 to July 25, 2025 for a phone used by Hugh Brown showed his device was most frequently near the Lancelot Court residence overnight, suggesting he stayed there.  (*Id.* ¶ 26.)  On May 23, 2025, law enforcement observed a Corvette Stingray—associated with Hugh and Brittney Brown since 2021—at the residence.  (*Id.* ¶¶ 22, 24.)  And on February 8, 2024, after Brittney Brown was arrested on state identity theft charges, she listed the Lancelot Court property as security for her bond.  (*Id.* ¶ 23).

---

[2] Inspector Speers simultaneously sought a warrant to search a second residence, located at 515 Lakeside View, Fairburn, Georgia, using the same affidavit.  [Doc. 56-2 at 2.]  Kevin Brown does not move to suppress the fruits of that search.

Other evidence linked the Defendants to the Lancelot Court address. In his affidavit, Inspector Speers related that in November 2023, U.S. Customs and Border Protection ("CBP") found 17 firearms and ammunition concealed in appliance shipments bound for the Dominican Republic. (*Id.* ¶ 10.) One of the firearms was traced back to Hugh Brown, who had purchased it from a firearms dealer in Fairburn on October 9, 2023. (*Id.* ¶ 11.) When he made the purchase, Hugh Brown listed the Lancelot Court residence as his address on ATF Form 4473.[3] (*Id.*) Hugh Brown also sought unemployment insurance after purporting to work in California in 2021 and 2022, and in his application, he identified the Lancelot Court residence as his mailing address. (*Id.* ¶ 16)

Inspector Speers also detailed alleged criminal activity that had been revealed during the investigation. Describing the basis for Count One of the indictment—the conspiracy to commit bank fraud charge—he explained that from about February 2022 through February 2025, Defendants submitted fraudulent vehicle loan applications to Navy Federal Credit Union ("NFCU") and Bank of America ("BOA") for purported private seller purchases that

---

[3] Inspector Speers explained that on November 29, 2023, federal law enforcement agents met Grace Brown, Hugh and Kevin Brown's mother, at the Lancelot Court residence. (Speers Aff. ¶ 13.) Grace Brown said that Hugh Brown did not reside there at the time. (*Id.*)

designated payees that sometimes included Defendants. (Speers Aff. ¶¶ 7(a)-(b), 15.) The applications described vehicles as collateral, but the VINs used often did not match the listed vehicles, and a fraudulent VIN was reused on multiple applications. (*Id.* ¶ 7(c).) With respect to the loans obtained from BOA, the applications also included fraudulent North Carolina titles. (*Id.* ¶ 7(d).) The NFCU loans, meanwhile, were disbursed based on vehicle information in the applications and required the borrower to furnish proof of title within three months, which the applicants generally failed to provide. (*Id.* ¶ 7(e).) On the applications, Defendants primarily claimed employment at Georgia Power; however, Georgia Power had no record of them ever working there. (*Id.* ¶ 7(f).) Two loans with Hugh Brown as payee listed identical monthly incomes for the putative debtors—$15,416.67—and the same applicant later claimed monthly income of $16,416.67 to support a loan that was made payable to Brittney Brown. (*Id.* ¶ 7(g).) And from December 2021 to November 2023, all three Defendants also sought personal loans falsely claiming Georgia Power employment. (*Id.* ¶ 7(h).)

Describing the basis for Count Two—the bank fraud charge against Hugh Brown—Inspector Speers explained that Brown made a fraudulent application for a PPP loan on June 26, 2020, on behalf of HABJ Consultation LLC ("HABJ"),

5

which Hugh Brown owned.  (Speers Aff. ¶ 8.)   Allegedly, Hugh Brown misrepresented that HABJ had nine employees and an average monthly payroll of $65,000.  (*Id.* ¶¶ 8, 14.)  He also allegedly submitted a fake IRS Form 940 claiming $779,998.91 in payments to employees of HABJ in 2019.  (*Id.* ¶ 8.)

Inspector Speers further stated that the remaining money laundering charges arise out of transactions made by Defendants in amounts over $10,000, involving proceeds of the auto loan and PPP bank fraud schemes.  (Speers Aff. ¶ 9.)

Inspector Speers also summarized alleged criminal activity that was not charged in the indictment.  He explained that in May 2022, Hugh Brown made fraudulent applications for the Employee Retention Credit on behalf of HABJ, resulting in a payment of $644,452.98.  (Speers Aff. ¶ 17.)  In support, he submitted IRS Form 941s for 2020 and 2021 that listed himself as the owner of HABJ.  (*Id.* ¶ 18.)  Hugh Brown allegedly disbursed $85,000 of the proceeds to Brittney Brown and $30,000 to Kevin Brown via checks.  (*Id.*)  Also, on October 12, 2023, Hugh Brown allegedly used $163,534.34 of the proceeds to purchase property in Fayette County, Georgia in a cash sale.  (*Id.*)

Inspector Speers also averred that in November 2021, Brittney Brown obtained a $96,165.67 loan from Ally Bank ("Ally") to purchase a 2022 Corvette

Stingray. (Speers Aff. ¶ 22.) On the application, she misrepresented that she was employed by Georgia Power—the same company that she and the other Defendants claimed to be employed by when submitting fraudulent auto loans. (*Id.*) In July 2023, she filed an identity theft claim (despite previously making several payments on the loan) with Ally, which the company denied. (*Id.*)

Meanwhile, according to the affidavit, in August 2022, Brittney Brown allegedly obtained a $60,000 loan from SoFi Bank, funneled the proceeds to K Rose Collection (a company she solely owned and operated), and used over $50,000 of the proceeds to pay off other creditors and make investments. (Speers Aff. ¶¶ 14, 23.) Additionally, on April 10, 2023, she falsely reported to the Fayette County Sheriff that the loan was procured—presumably by someone other than herself—using identity theft. (*Id.* ¶ 23.) Ultimately, Brittney Brown was arrested on February 8, 2024, on state charges of making false statements related to her claims of identity theft and theft by deception. (*Id.*) She was released on bond and, as noted, used the Lancelot Court residence as security. (*Id.*)

Inspector Speers requested authorization to seize and search electronic devices in the residence. [*See* Doc. 56-2 at 1 (warrant application), 22-25 (Attachment B to warrant application, identifying property sought to be seized and searched).] He explained that electronic devices—including phones, tablets,

and computers—can store information for long periods of time and that information can sometimes be recovered using forensic tools. (Speers Aff. ¶¶ 27, 28.)  He further stated that he knows from experience that individuals engaged in fraudulent activity are likely to maintain business records over time in both paper and electronic form, including loan applications, car titles, and proof-of-employment records. (*Id.*)  He specifically explained that some of the fraudulent vehicle loans at issue in this investigation were applied for online, and disbursements were made via physical checks. (*Id.*)  Relatedly, he also stated that individuals involved in fraud commonly keep their records close at hand in safe locations. (*Id.* ¶ 29.)

Inspector Speers further asserted that there was probable cause to believe that the relevant records would be stored electronically because computers and smartphones contain enduring forensic evidence—including evidence contained in browser history caches, deleted data repositories, and other usage artifacts—and explained that the warrant application sought permission to search for such "records found [at the Lancelot Court residence], in whatever form they are found," including on hard drives, phones, computers, and other storage media. (Speers Aff. ¶¶ 27, 30, 31.)  He described the types of forensic evidence sought; why entire devices may need to be seized or imaged off-site due to time, technical

8

requirements, and data volume; and how later review will proceed to locate evidence of the offenses on those devices. (*Id.* ¶¶ 32-35.)

In Attachment B to the application and warrant, Inspector Speers laid out the evidence that he wanted authority to seize from the residence—namely, evidence relating to violations of 18 U.S.C. § 922 (trafficking in firearms), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1349 (bank fraud conspiracy), and 18 U.S.C. § 1957 (money laundering) occurring after January 1, 2020. [Doc. 56-2 at 29.] He specifically requested authorization to seize and search computers, tablets, smartphones, and other storage media, as well as forensic evidence from the devices related to their use and ownership, including "access, use, and events relating to crime under investigation and to the computer user." [*Id.* at 30-32.]

Judge Salinas approved the warrant for the Lancelot Court residence based on Inspector Speers's affidavit on July 28, 2025. [Doc. 56-2 at 26-32.] The next day, July 29, 2025, federal agents executed the search warrant. [Doc. 56-3 at 2.] Kevin and Hugh Brown were arrested at the Lancelot Court residence.[4] [Docs.

---

[4] Arrest warrants for all three Defendants had been issued by Judge Elizabeth McBath on June 11, 2025, following the return of the indictment. [Docs. 7, 8, 9.]

41 (executed arrest warrant as to Kevin Brown), 42 (executed arrest warrant as to Hugh Brown).]  According to Kevin Brown, the agents seized an Apple laptop and an iPhone from the room in which he was staying, and he admits that those devices belong to him.  [Doc. 57 at 3.]

Additional facts are discussed, as necessary, in the analysis below.

## II.   DISCUSSION

### A.   The Parties' Arguments

Kevin Brown moves to suppress the Apple laptop computer and iPhone (and data contained on them) that were seized from his room.  [Doc. 57 at 3 ("The items at issue and the fruits sought to be suppressed are that of the computer of Kevin Brown and the black iPhone contents.").]  He asserts that the warrant failed to establish probable cause for seizing the electronics because the affidavit did not establish a nexus between criminal activity and any specific device at the residence.  [*Id.* at 3-4.]  He points out that the affidavit did not allege that any criminal activity occurred at the residence or provide information (such as IP addresses or Wi-Fi accounts) linking any device at the residence to criminal activity.  [*Id.* at 4.]  He also contends that the affidavit does not allege who owned any of the seized devices, or even that he committed a crime.  [*Id.* at 4.]

Kevin Brown also argues that, more generally, it was not objectively reasonable to believe that evidence of criminal activity would be found at the Lancelot Court residence because the only connection was "a mailing addressed of an accused." [Doc. 57 at 5-6.] Finally, he argues that the warrant was overbroad and should not be saved by the good-faith exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897 (1984). [*Id.*]

The government responds that Inspector Speers's affidavit established a sufficient nexus between the Defendants and the Lancelot Court residence, and between the premises and the criminal activity, to satisfy the requirements of the Fourth Amendment. [Doc. 62 at 6-9.] In the government's view, based upon Inspector Speers's affidavit, there was a fair probability that evidence of the enumerated offenses would be found at the residence, where Hugh Brown—whose activities the probable cause discussion focused on—appeared to be staying over the prior month. It also explains that the fact that Kevin Brown resided there does not negate probable cause, but merely gives him standing to challenge the search. [*Id.*]

As for the purported lack of specify about devices or accounts to be searched, the government argues that omissions of potentially helpful details are irrelevant if the affidavit otherwise shows probable cause. [Doc. 62 at 8-9.] In

any event, the government points out that probable cause existed to seize and search electronic devices because the affidavit stated that NFCU loan applications were submitted online, which justifies the seizure of computers, tablets, and smartphones for evidence of that criminal activity. [*Id.*] The government further argue that the warrant was sufficiently particularized because Attachment B provided adequate detail to guide agents in selecting electronic items to seize and search. [*Id.* at 10-11.]

Finally, the government argues that even if the warrant were invalid for lack of probable cause or particularity, suppression is still unwarranted under *Leon* because the agents reasonably relied on a warrant showing at least an indicia of probable cause linking Kevin Brown, the premises, and the underlying criminal activity. [Doc. 62 at 12-13.]

### B.   Discussion

#### 1.   Probable Cause

The Court first takes up Kevin Brown's arguments that the warrant was not supported by probable cause. A judicial officer considering an application for a search warrant must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v.*

*Gates*, 462 U.S. 213, 238 (1983).  "[T]he affidavit should establish a connection between the defendant and the [place] to be searched and a link between the [location] and any criminal activity."  *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002).  "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant."  *United States v. Bushay*, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984)); *see also Gates*, 462 U.S. at  238–39 (1983) (stating that "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed") (cleaned up).  As a result, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."  *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing *Gates*, 462 U.S. at 236-37, and *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

"To establish probable cause to search a residence, the supporting affidavit must establish a connection between the defendant and the residence to be

13

searched and a link between the residence and any criminal activity." *United States v. Rivers*, 134 F.4th 1292, 1304 (11th Cir. 2025) (alteration adopted; quotation marks omitted). The government does not need to allege "that the illegal activity occurred at the location to be searched." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009). Rather, "the affidavit must supply the authorizing magistrate [judge] with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a 'safe yet accessible place.'" *Id.* (quoting *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999)). As the Circuit explained:

> The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.

*Id.* (quoting *United States v. Green*, 634 F.2d 222, 226 (5th Cir. Unit B Jan. 1981)).

Here, the affidavit establishes a connection between the Defendants and the Lancelot Court residence, and also created a fair probability that evidence of criminal activity—including electronically stored records retaining to that activity—would be found there. First off, there was ample evidence that connected all three Defendants in this case to the residence over a several-year

14

period, up to and including the time when agents executed the warrant. To recap, Inspector Speers explained that Defendants listed it as their address on their current Georgia driver's licenses (Speers Aff. ¶ 12); they all received mail there (*id.* ¶ 20); geolocation data showed Hugh Brown's phone was most frequently near the residence overnight from late June to late July 2025 (*id.* ¶ 26); Hugh and Brittney Brown's car was observed at the residence in May 2025 (*id.* ¶¶ 22, 24); Brittney Brown identified the residence as collateral for her bond on state criminal charges in February 2024 (*id.* ¶ 23); and Hugh Brown listed the address on the ATF Form 4473 in October 2023, as well as his application for unemployment insurance (*id.* ¶¶ 11, 16).  And although, at one point in November 2023, Grace Brown denied that Hugh Brown resided at the Lancelot Court residence (*see id.* ¶ 13), this did not negate probable cause, as there was abundant evidence to the contrary, including more recent evidence from 2024 and 2025 showing that he in fact stayed at the property.[5]

---

[5] Kevin Brown argues in passing that it was not reasonable to believe that there was evidence of criminal activity at the Lancelot Court residence because, as he puts it, "[t]here are two target residences in this case, the other being the residence where Hugh Brown and his wife resided." [Doc. 57 at 6.]  But as just discussed, there was ample evidence connecting Hugh Brown and Brittney Brown to the Lancelot Court address, irrespective of the evidence linking them to the Lakeside View address.

The affidavit also established a sufficient nexus between the residence and evidence of the alleged criminal activity. The affidavit details criminal conduct by all three Defendants going back to June 2020 when Hugh Brown allegedly first applied for PPP funds. And it is of no moment that most of the alleged criminal activity concerned Hugh and Brittany Brown, rather than Kevin Brown, as there was ample evidence suggesting that Hugh Brown stayed at the Lancelot Court residence, raising the fair probability that evidence relating to his (that is, Hugh Brown's) criminal activity would be stored there.

The warrant also provided ample basis for Judge Salinas to find there was a fair probability that evidence of criminal activity would be found on electronic devices at the Lancelot Court residence. The affidavit gave examples of records that were allegedly used to prepare fraudulent auto loan applications, including allegedly altered and/or falsified vehicle titles and documents purporting to show proof of employment; and Inspector Speers explicitly stated that such records "may be in paper form or saved electronically within computers or cellular phones" and that "it is anticipated that records will be exist in both formats." (Speers Aff. ¶ 28.) To support this assertion, the affidavit explained "that the fraudulent vehicle loans from NFCU were applied for online" and that "disbursements for the loans were made via physical checks." (*Id.*) Meanwhile,

16

"fraudulent vehicle loans from BOA included fraudulently altered titles for vehicles purporting to be from North Carolina" and "Defendants are likely to possesses the original titles, prior to alteration." (*Id.*)  What's more, the auto loan fraud scheme was just one of several fraud schemes identified in the affidavit going back to at least 2020, when Hugh Brown allegedly applied for a fraudulent PPP loan.  This was sufficient to allow Judge Salinas "to use her common sense" to find that evidence of a multi-year fraud scheme—involving multiple car loans, at least two banks, and myriad documents used in online applications—would be found at the premises in both paper and electronic form.  *United States v. Thompson*, No. 1:19-CR-378-ELR-CMS, 2020 WL 12800821, at \*5 (N.D. Ga. Nov. 5, 2020), *report and recommendation adopted*, 2021 WL 5370880 (N.D. Ga. Nov. 18, 2021).

Kevin Brown's arguments to the contrary are not persuasive.  He argues that there was "no device, IP address, or WiFi account that ties illegality to the residence location."  [Doc. 57 at 4.]  But there is no requirement that the illegal activity must occur at the residence.  *Kapordelis*, 569 F.3d at 1310.  Rather, the government must simply show there is a probable link between the residence and the criminal activity such that there is a fair probability that evidence of a crime would be located there.  *Id.*  And as explained, it did so here.

He also argues that "[n]o criminal conduct was alleged as to [himself]"; however, that is simply not true.  [Doc. 57 at 4.]  The affidavit alleges that he was involved in—and indeed, had been indicted for—conspiracy to commit bank fraud and money laundering, that he sought personal loans falsely claiming that he was employed by Georgia Power, and that Hugh Brown allegedly disbursed $30,000 of fraudulently-obtained funds to him.  (Speers Aff. ¶¶ 7(a), 7(f), 15, 18.)  But even more foundationally, as already explained, the warrant was not premised solely on Kevin Brown's alleged criminal activity—it mostly relied on the actions of Hugh and Brittany Brown, who also had significant ties to the Lancelot Court residence.

Kevin Brown next asserts that the affidavit failed to establish a nexus to the Lancelot Court residence because "the affidavit relie[d] solely on mailing-address association rather than facts establishing that the suspect resided at or conducted criminal activity from the location searched."  [*Id.* at 5.]  Again, that argument is not accurate.  As detailed above, the affidavit is replete with information linking all three Defendants to the residence, and it explains how and why evidence of criminal activity would be found there.

Kevin Brown cites a Fifth Circuit decision, *United States v. Freeman*, 685 F.2d 942 (5th Cir. 1982), for the proposition that "where probable cause a crime was

committed exists it does not provide probable cause to search his house for evidence of that crime." [Doc. 57 at 6.] This comes close to misrepresenting what *Freeman* says. The court actually wrote, "the fact that there is probable cause to believe that a person has committed a crime does not ***automatically*** give the police probable cause to search his house for evidence of that crime." *Freeman*, 685 F.2d at 949 (emphasis added). The court further explained that "facts must exist in the affidavit which establish a nexus between the house to be searched and the evidence sought." *Id.* As discussed at length above, the affidavit here did not merely contend that because the inhabitants of a residence allegedly committed criminal activity, the residence could be searched. Rather, the affidavit tied the residence and electronic devices to the alleged criminal activity, thereby providing the requisite nexus to believe evidence of the criminal activity would be contained in them. *Freeman*, therefore, does not support a contrary conclusion.

Kevin Brown's reliance on *Riley v. California*, 573 U.S. 373 (2014), meanwhile, which he contends bars "the type of general, exploratory search the Fourth Amendment was designed to prohibit," is also misplaced. [Doc. 57 at 2.] *Riley* involved the warrantless search of a cell phone incident to an arrest for a traffic violation. *See Riley*, 573 U.S. at 378. The issue there was "how the search

19

incident to arrest doctrine applies to modern cell phones," and the decision simply recognized that officers must generally secure a warrant before conducting such a search. *Id*. at 385-86. Here, of course, the government obtained a warrant. *See United States v. Adesayo*, No. 1:24-CR-154-MHC-RGV-3, 2025 WL 3653517, at *6 (N.D. Ga. Dec. 17, 2025) (distinguishing *Riley* on similar grounds).

For these reasons, then, the Court finds that the warrant was sufficiently supported by probable cause.

### 2. Particularity

Kevin Brown's argument that the warrant was unconstitutionally overbroad fares no better. The Fourth Amendment requires a warrant to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This means that "a warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally over broad, and any evidence seized from the resulting search must be excluded from trial." *United States v. Carroll*, 886 F.3d 1347, 1351 (11th Cir. 2018) (alteration adopted, quotation marks omitted). "While a search warrant must contain sufficient specificity to guard against a general search, the test is the reasonableness of the description. Elaborate specificity is unnecessary." *Id.* (quoting *United States v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982)). Likewise,

courts should apply the "particularity requirement 'with a practical margin of flexibility, depending on the type of property to be seized.'" *United States v. Brooks*, 648 F. App'x 791, 793 (11th Cir. 2016) (quoting *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982)). Thus, "in determining the sufficiency of a warrant's description, [a reviewing court must] consider whether the description 'is as specific as the circumstances and nature of activity under investigation permit.'" *Id.* (quoting *Wuagneux*, 683 F.2d at 1349).

Moreover, "[t]he prohibition of general searches is not to be confused with a demand for precise ex ante knowledge of the location and content of evidence." *United States v. Addaquay*, No. 1:20-CR-126-LMM-JSA-1, 2021 WL 1541051, at *5 (N.D. Ga. Apr. 20, 2021) (quoting *United States v. Richards*, 659 F.3d 527, 541 (6th Cir. 2011)). "This is particularly so in white-collar fraud cases such as this, which 'may require the assembly of a "paper puzzle" from a large number of seemingly innocuous pieces of individual evidence.'" *Id.* (quoting *Wuagneux*, 683 F.2d at 1349). "A warrant must only offer a description of the physical or digital area to be searched that is 'as specific as the circumstances and nature of activity under investigation permit.'" *Id.* (quoting *Wuagneux*, 683 F.2d at 1349).

Here, the warrant's description of the items to be seized passes constitutional muster. Paragraph 1 of Attachment B to the warrant, which

21

identifies the property to be seized from the residence, limited the seizure to evidence of specifically-enumerated statutory offenses.   [Doc. 56-2 at 29. [6]] "Warrants that are limited to seizure of evidence of specific, enumerated statutory offenses are routinely found to be sufficiently particularized." *United States v. Bussey*, No. 5:21-CR-9, 2025 WL 1652070, at *12 (S.D. Ga. Apr. 4, 2025) (collecting cases), *report and recommendation adopted*, 2025 WL 1502991 (S.D. Ga. May 27, 2025).   And while Paragraph 1 of Attachment B authorized the seizure of "[c]omputers, tablets, and smartphones," Paragraph 2 further limited the seizure of information from electronic devices to 14 categories of electronically stored information that may constitute evidence regarding the subject offenses. [Doc. 56-2 at 30-31 (providing that "[f]or any computer, storage medium or cellular smartphone for which seizure is otherwise authorized by this warrant, and any computer, storage medium or cellular phone that contains or in which

---

[6] Specifically, Paragraph 1 begins as follows:

All records and information relating to violations of 18 U.S.C. 922 (trafficking in firearms), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. 1344 (bank fraud), 18 U.S.C. 1349 (bank fraud conspiracy) and 18 U.S.C. 1957 (money laundering) (together the "Subject Offenses"), by Hugh A. Brown, Jr., Brittney Brown a.k.a. Brittney Gilliams, and Kevin Michael Brown, in the Northern District of Georgia and elsewhere, and occurring after January 1, 2020[.]

[Doc. 56-2 at 29.]

is stored records or information that is otherwise called for by this warrant," law enforcement was authorized to seize only specific categories of data outlined in Paragraph 2, Subparagraphs a. through n.).]   To be sure, some of those "categories permit the searcher to access large amounts of information on a device," but "the warrant does not simply cite criminal violations and then seek an unlimited search of every device on the premises." *Bussey*, 2025 WL 1652070, at *13.   "Rather, it seeks specific categories of data that are evidence of the violations," which "cuts in favor of the warrant being sufficiently particularized." *Id.*

Citing two out-of-circuit decisions, *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017) and *United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010), Kevin Brown nevertheless argues that the warrant is unconstitutionally overbroad because it permitted the blanket seizure of any electronic device.  [Doc. 57 at 5.]   Those cases—which of course, are not binding here—are distinguishable.   In *Griffith*, the defendant was the suspected getaway driver in a homicide that had occurred more than a year earlier, and had been incarcerated for most of the intervening period.  *Griffith*, 867 F.3d at 1269.   The court held that a warrant authorizing seizure of "all cell phones and electronic devices" in the defendant's residence (which he shared with his girlfriend) was overbroad because the supporting

23

affidavit established probable cause to search only those "devices owned by Griffith, or devices linked to the shooting." *Id.* at 1276 ("Yet the warrant did not stop with any devices owned by Griffith . . . .  It broadly authorized seizure of *all* cell phones and electronic devices, without regard to ownership.").  Here, by contrast, the affidavit established probable cause to believe that all three Defendants—and especially Hugh Brown and Kevin Brown—resided or stayed at the Lancelot Court residence; that all three Defendants, in some form or another, had been engaged in various fraud schemes for almost five years; and that they transacted the scheme or at least had evidence of the scheme stored on their computers, phones, and/or other electronic storage media.  Indeed, the nature of the offenses under investigation—including, for instance, that at least some of the loan applications were made via online—made it likely that some significant portion of the evidence was maintained, at least to some extent, in electronic format and that such evidence would be stored on their electronic devices.  Accordingly, *Griffith* does not alter the Court's analysis.

In *Rosa*, meanwhile, the Second Circuit found that a residential search warrant violated the Fourth Amendment's particularity requirement because it "directed officers to seize and search certain electronic devices, but provided them with no guidance as to the type of evidence sought." *See Rosa*, 626 F.3d at

24

62 (citing *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992)). Significantly, the warrant was deemed defective not because the term "electronic equipment" was too broad, but rather because it failed to connect the items to be searched and seized with the suspected criminal activity. As the Circuit Court explained, the warrant only contained the following language:

> The property sought to be seized and searched is described as computer equipment, electronic digital storage media included but not limited to floppy diskettes, compact disc, hard drives whether mounted in a computer or otherwise, video or audio tapes, video surveillance systems, video and digital camera systems, printing devices, monitors, firearms and any written and/or printed and/or electronic stored notes or records which would tend to identify criminal conduct and any personal papers or documents which tend to identify the owner, leasee or whomever has custody or control over the premises searched or the items seized.

626 F.3d at 58-59. The government argued that documents supporting the application for the search warrant could cure any overbreadth concerns on the face of the warrant, but the court disagreed, explaining that under Supreme Court precedent, a search warrant cannot be cured by its supporting documents that were not incorporated by reference into the warrant. *Id.* at 62-64. The court therefore limited its analysis to the sufficiency of the warrant itself, which it found to be "overbroad and provided the officers with no judicial limit on the scope of their search, especially as it related to the seizure of electronically stored notes and records tending to identify criminal conduct." *Id.* at 64; *see also United*

*States v. Smith,* No. 15-CR-249, 2016 WL 11445693, at *4 (E.D. Wis. Apr. 18, 2016),

*report and recommendation adopted,* 2016 WL 2853560 (E.D. Wis. May 16, 2016)

(distinguishing *Rosa* for similar reasons).  Here, there is no issue about whether

supporting documents were properly incorporated, and Attachment B to the

warrant limited the search to evidence of certain enumerated offenses.  As such,

*Rosa* also will not change the result here.

### 3.    *Leon* **Good Faith Exception to the Exclusionary Rule**

Finally, even if the warrant were constitutionally infirm, the government

has shown that the good faith exception to the exclusionary rule would apply to

save the fruits of the warrant from suppression.  The exclusionary rule acts as a

remedy to unconstitutional searches by prohibiting the government from using

evidence seized as a result of an illegal search in a subsequent criminal

prosecution.  *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002).  But

evidence "obtained in objectively reasonable reliance on a subsequently

invalidated search warrant" is generally not subject to the exclusionary rule.  *Leon*,

468 U.S. at 922-23.  Suppression is an appropriate remedy, however, where (1)

the issuing magistrate judge was "misled by information in an affidavit that the

affiant knew was false or would have known was false except for his reckless

disregard of the truth"; (2) the issuing magistrate judge wholly abandoned his or

her judicial role; (3) the warrant was based on an affidavit so devoid of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient that the executing officers could not presume it to be valid. *Id*. at 923.

Here, none of the exceptions to *Leon* apply. First, there is no indication that the affidavit upon which the warrant relied was somehow false. Second, there is no suggestion that Judge Salinas abandoned her judicial role. Third, the affidavit was not so devoid of probable cause to render belief in its existence unreasonable. Indeed, as Inspector Speers explained, the government sought the search warrant after defendants had been indicted and arrest warrants issued, establishing probable cause connecting defendants to the charged offenses. Fourth, and contrary to Kevin Brown's single-sentence argument otherwise, the warrant was not so deficient that investigators should have presumed it was invalid. [*See* Doc. 57 at 6.] As explained above, the warrant affidavit provided a sufficient nexus between the Lancelot Court residence and the evidence of criminal activity, including evidence that was stored on electronic devices at the residence. Thus, even if the search warrant here were found invalid for any of the reasons that Kevin Brown contends, the good faith exception to the warrant requirement

applies, and the evidence seized pursuant to the warrant should still not be suppressed.

## III.   CONCLUSION

For the foregoing reasons, the Court finds that the warrant was supported by probable cause and reasonably described the place to be searched and the items to be seized.   Alternatively, even if the warrant were constitutionally infirm, the *Leon* good faith exception to the exclusionary rule applies, making suppression inappropriate.   Accordingly, it is **RECOMMENDED** that Kevin Brown's motion to suppress [Doc. 57] be **DENIED**.

I have now addressed all pretrial matters referred to me and have not been advised of any impediments to the scheduling of a trial.   Accordingly, this case is **CERTIFIED READY FOR TRIAL**.[7]

IT IS SO ORDERED AND RECOMMENDED this 18th day of March, 2026.

_____
JOHN K. LARKINS III
United States Magistrate Judge

---

[7] The cases as to the other defendants, Hugh and Brittney Brown, have previously been certified ready for trial.  [Doc. 51.]